Filed 4/25/13  P. v. Collado CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>　　　Plaintiff and Respondent,<br><br>v.<br><br>FERNANDO A. COLLADO,<br><br>　　　Defendant and Appellant. | A135247<br><br>(San Francisco County<br>Super. Ct. No. 211410) |

　　　Fernando A. Collado (appellant) was convicted, following a jury trial, of two misdemeanor counts of violating a restraining order.  On appeal, appellant contends the trial court erred and violated his constitutional rights when it refused to engage in de novo review of the validity of the restraining order on which his convictions were based.  We shall affirm the judgment.

## PROCEDURAL BACKGROUND

　　　Appellant was charged by information with one count of stalking (Pen. Code, § 646.9, subd. (a)—count one);[1] one count of stalking in violation of a restraining order (§ 646.9, subd. (b)—count two); and four misdemeanor counts of contempt of a court order (violating a restraining order) (§ 166, subd. (a)(4)—counts three through six).[2]

　　　At the conclusion of appellant's trial, a jury found him guilty of counts three and four, the remaining misdemeanor counts for violating a restraining order.  The jury

_____

[1] All further statutory references are to the Penal Code unless otherwise indicated.

[2] Counts five and six were subsequently dismissed due to witness unavailability.

1

deadlocked on counts one and two, and the court declared a mistrial as to those two counts.

On April 30, 2010, the trial court imposed two consecutive six-month sentences on counts three and four.

A notice of appeal was initially filed in the Appellate Division of the San Francisco Superior Court. The matter was subsequently transferred to this court, and a notice of appeal was filed in this court on March 12, 2012.

## FACTUAL BACKGROUND

### Prosecution Case

Gilberto Orozco testified that he lived on Somerset Street in San Francisco with his wife Luz Maria Castillo and their young children. He had known appellant, his first cousin, all of his life. They had previously had a close, friendly relationship. In 2006, Orozco hired appellant to paint his house. One day, Orozco discovered appellant in the garage smoking what appeared to be crystal meth. Orozco told him to stop painting and paid him for his work.

The Orozcos had no further contact with appellant until March 2009, when appellant began engaging in harassing behavior. He called Orozco numerous times for more than a month, and said things like, " 'I'm going to get you' " and " 'I'm coming after you.' " He left voicemails and when Orozco called him back, appellant would be incoherent, speaking "gibberish" and "nonsense." Appellant called on both Orozco's cell phone and home phone. Orozco told appellant to stop calling and, eventually, the Orozcos stopped answering their phones. In May 2009, appellant began calling again and threatened to kill Orozco.

When Orozco learned in May 2009 that appellant had come to his house and threatened his family while he was not at home, he became concerned that appellant might hurt him or his family. After a police officer recommended that they get a restraining order, Castillo got the forms. Orozco then filled out the forms with her help, and Castillo filed the restraining order application with the court.

2

Both Orozco and appellant testified at the restraining order hearing. Appellant's behavior at the hearing was "menacing," and he testified that Orozco's family had poured gasoline on him and that Orozco "had a mannequin, that was out to kill him." At the conclusion of the hearing, a judge issued a restraining order against appellant.

Appellant, however, continued to harass the Orozcos, including calling 911 in August 2009 and reporting that Orozco was beating his wife. Orozco was afraid for his safety and for that of his family. On December 23, 2009, Orozco was at work when he received phone a call from his next-door neighbor who said there was "a crazy guy" outside who had come over with the police and was asking about Orozco. Orozco later received phone messages from his wife, in which she said that appellant was "out front." He called her back repeatedly but could not reach her, which made him afraid that appellant had killed his wife and children. He went home, but his family was not there. His neighbor later told him that his wife did not want to come home until Orozco was there. He saw appellant driving by in front of his house and called 911. Officers came over and took a statement.

Orozco's wife, Castillo, testified that, after weeks of harassing and threatening phone calls from appellant that began in March 2009, appellant came to their house in April or May 2009. She watched through an open window as he put on a pair of black gloves and a beanie and came up the stairs to their front door. Appellant asked through the window if Orozco was home and Castillo said he was not. He demanded that she open the door, but she refused. He started knocking harder and also kicked the door. He said "that he was going to put an end to this, to let my husband know he was coming for him." He then said, " 'I'm going to kill him.' " Castillo called 911, but by the time police arrived, appellant was gone. Appellant's behavior scared Castillo, who was about six months pregnant and had her two-year-old son in the house.

Castillo further testified that, in early August 2009, a police officer came to the Orozco home regarding a report received during a 911 call that Castillo and her son were being hurt by Orozco. Castillo told the officer that everything was fine and that her husband had been at work since early that morning. She later learned that it was

3

appellant who had called 911.  The police came to the Orozco home two additional times for well-being checks.  The recording of an October 1, 2009 call to 911 was played at trial and Castillo identified appellant as the caller.

San Francisco Police Officer Rolando Canales testified that, on the afternoon of December 23, 2009, he was dispatched to an address on Somerset Street not far from the Orozco home.  There were numerous officers and paramedics at the scene.  A man Canales identified at trial as appellant approached and said he needed someone to check on the well-being of a relative at a nearby address on Somerset.  He said he felt that the relative was being held against his or her will in the garage of the house.  Canales and appellant went to a house on Somerset, and Canales knocked on the front door.  There was no answer, but a Hispanic woman approached and she and appellant briefly engaged in a dispute.  Canales then advised appellant that if there was a court order for him not to be there, he should leave.  Canales left the area after seeing appellant leave.

Yvonne Villegas, who lived next door to the Orozcos, testified that, she was outside her house about 3:30 p.m. on December 23, 2009, when she saw a patrol car coming slowly down the street with a man walking beside it.  The man walked up to Villegas and asked if Castillo was home.  She said no, and he introduced himself as " 'Fernando, the man with the mannequin.' "  He also said, " 'Do you know that your neighbors, Lucy and Gill, have cyber sex.' "  While the police officer knocked on the front door of the Orozco home, appellant began knocking and then kicking on the garage, calling for "Gill."  Villegas called Castillo, who asked to speak with the police officer, but he had already gone by then.  Appellant was still there, but left soon after.  Appellant drove up a short time later and asked Villegas if Orozco was home.  He then said, " 'Tell Gill I'll be back,' " and drove away.  She then saw appellant driving around the area; he drove by the Orozco house one more time about 5:15 p.m.

Castillo testified that after Villegas called her, she called 911 to request that an officer be sent to her home because a relative against whom she had a restraining order was at her door, but no officer was dispatched.  She was unable to reach her husband, and

4

so she sent him a text message. When she arrived home about 6:00 p.m., Orozco and Villegas were waiting outside. Appellant was not there.

Castillo also testified that she had received many harassing phone calls from her sister-in-law after Castillo temporarily obtained guardianship of the sister-in-law's baby during a custody dispute between the sister-in-law and her husband, who was Castillo's brother. Castillo obtained a restraining order against her sister-in-law in May 2009. She later called police when her sister-in-law came to her home. Her car was vandalized several times. Castillo did not see who did it, but she thought her sister-in-law or appellant could have been responsible for the vandalism.

*Defense Case*

Dr. Paul Good, a clinical and forensic psychologist, conducted an evaluation of appellant. He concluded that appellant suffered from a delusional disorder of the persecutory type. Specifically, he believed that appellant had a "fixed belief that the Orozcos are manipulating him through cyberspace through a helmet" implanted on his head that produced "visceral physical sensations." Appellant believed they were using a voodoo mannequin to manipulate him. He also believed that Orozco's sister was erotically stimulating him through the mannequin.

*Rebuttal*

San Francisco Police Officer Kathleen Walsh testified that, on June 19, 2008, she was dispatched to the home of Filiberto Fuentes in South San Francisco, where she had been dispatched many times before. On that occasion, Fuentes said that appellant had come to his house and was hitting the garage door with a baseball bat and was challenging Fuentes to come outside and fight him. Walsh then went to appellant's nearby residence and spoke with him. Appellant said that Fuentes had woken him up by taunting him and pumping butane gas into his room, which made him angry. Walsh and other officers had been called out to the same location over 16 times in response to appellant complaining that neighbors were pumping gas into his bedroom or in response to calls from Fuentes.

5

## DISCUSSION

Appellant contends the trial court violated his constitutional rights to due process, to present a defense, and to confront witnesses when it refused to engage in de novo review of the validity of the restraining order on which his convictions were based.

### Trial Court Background

Before trial, defense counsel requested that the trial court hold an Evidence Code section 402 hearing to determine whether the prior issuance of the restraining order was supported by sufficient evidence, for purposes of the charges in this case related to violating that order. Counsel requested, in the alternative, that the court instruct the jury that it must find that the restraining order was lawfully issued before it could use it as the basis for finding appellant guilty of any of the relevant charges. The court stated that it did not believe it had jurisdiction to perform a de novo review regarding the propriety of the issuance of the restraining order. The court reserved ruling on both requests.

Subsequently, after the close of the prosecution's case, defense counsel again questioned the validity of the restraining order and requested that the court "find that the restraining order was unlawfully issued and simply take it out of the case," or that it instruct the jury about what was required for the issuance of the restraining order. Defense counsel observed that the evidence at trial had shown that the restraining order application was filled out by Castillo, based in part on her firsthand knowledge of the events of May 18, 2009, but was signed by Orozco, who had no personal knowledge of those events. Counsel also noted that the evidence had shown that the Orozcos were unsure about who had vandalized their garage and car, even though this was included in the restraining order application.

Counsel continued: "Now—we look at what we know about the evidence now, and we look back at what is required for the issuance of the restraining order. Is there clear and convincing evidence of either violence or a credible threat of violence or a course of conduct that would cause a reasonable person substantial emotional distress? And now we realize there was very little evidence before the court at least from anybody

6

with firsthand knowledge about it. And we now know that some of that stuff in that report, even hearsay, is not true."

The following colloquy between the court and defense counsel then ensued:

"THE COURT: I'll just cut to the chase on the request that I find that the restraining order was unlawful. Again, you're asking this court to conduct a de novo review, which the court—there's no legal authority for that review. His avenue of review if he wanted a review would have been to have appealed the order. I'm not going to disturb the facts and the findings of [the commissioner]. He was present to witness the demeanor of both of these parties at the hearing, which is a significant part of this . . . in any court's assessment on a civil restraining order, the body language that the court sees. . . . [¶] . . . I want to make clear on the record that I'm not reviewing [the commissioner's] order. But the court made clear if there was evidence on the stand that any one completely falsified the information in the document or at the hearing, that I would revisit the issue. That hasn't happened.

"And to the extent that we're talking about the single issue of the car being vandalized, that was but one factor that was in the record before [the commissioner]."

The court then reviewed the transcript from the restraining order hearing and noted that appellant did not deny going to the Orozco home on May 18. Rather, "[i]t was a dispute of what happened at the house." The court then reiterated that there was nothing before it "that would cause a de novo review of the findings of [the commissioner] in issuing the restraining order." Counsel objected, stating that he believed the court could collaterally review the commissioner's order.

The court responded that, "to make the record clear, even if the court would review it, there is sufficient evidence in this record when someone comes to the house of a woman who is pregnant and she's home alone with a two-and-a-half-year-old child and her mother and that person threatens and there's been a series of telephone calls and the person is on drugs, that would—even if this court were to engage in a de novo review not having the benefit of seeing the parties here as [the commissioner] did, that would provide clear and convincing evidence, particularly because the defendant did not deny

7

that he went to the house. And moreover, when he engaged with the court, he began talking about the Orozco [*sic*] throwing gasoline on him before he came to the hearing in the morning and trying to connect to him through cyberspace. So the court would, even if it had to engage in that review, find that there is sufficient evidence—clear and convincing evidence for [the commissioner] to have issued the restraining order."

### *Legal Analysis*

In *People v. Gonzalez* (1996) 12 Cal.4th 804, 818 (*Gonzalez*), the California Supreme Court explained that "the defendant in a contempt proceeding in this state may challenge the validity of an injunction, the violation of which is the basis for the contempt prosecution, even if no such claim was made when the injunction issued." Appellant argues that the trial court in this case was required, pursuant to *Gonzalez*, to engage in de novo review of the evidence offered in support of the request for the restraining order. Respondent counters that the trial court correctly concluded that it did not have authority to review the validity of the restraining order.

We need not decide whether appellant is correct that the trial court erroneously concluded that it was not authorized to engage in a de novo review of the evidence supporting the restraining order. (See *Gonzalez*, *supra*, 12 Cal.4th at pp. 818-819.) That is because, even assuming the trial court erred, the colloquy between the court and counsel reveals that the court did in fact engage in a detailed review of the validity of the restraining order—which included an examination of the reporter's transcript from the hearing on the restraining order and the order itself—and specifically concluded that it "would, even if it had to engage in that review, find that there is sufficient evidence—clear and convincing evidence for [the commissioner] to have issued the restraining order."

In reaching its conclusion, the court considered, and rejected, counsel's concerns about the fact that it was Orozco's wife, Castillo, who had first-hand knowledge of the events of May 18, 2009, while it was Orozco who testified at the hearing. The court also considered the fact that, while the Orozcos had requested the restraining order based in part on appellant's vandalism of their garage and car, their trial testimony showed that it

8

was uncertain whether it was appellant who had engaged in the vandalism. As the court noted, the evidence in support of the restraining order included not only the events of May 18, 2009, and the vandalism, but also evidence of the repeated threatening telephone calls to Orozco, the fact that appellant was on drugs, and the fact that he told the commissioner that Orozco had thrown gasoline on him before he came to the hearing and had tried to connect to him through cyberspace. We find the court's reasoning and its conclusion that the restraining order was properly issued to be sound.

Hence, even assuming the court erred when it ruled that it did not have the authority to review the evidence supporting the commissioner's determination, given the fact that such a review did take place, the allegedly erroneous ruling was plainly harmless beyond a reasonable doubt. (See *Chapman v. California* (1967) 386 U.S. 18, 24.)[3]

### *DISPOSITION*

The judgment is affirmed.

_____
Kline, P.J.

We concur:

_____
Haerle, J.

_____
Richman, J.

_____

[3] Appellant also argues, for the first time on appeal, that "[Orozco's] testimony that appellant was not in his right mind at the restraining order hearing" calls into question whether appellant was capable of meaningfully participating in the hearing and is another factor demonstrating "that it cannot be said, beyond a reasonable doubt, that the order was lawfully issued." Appellant has forfeited this issue due to his failure to raise it in the trial court. (See *People v. Williams* (1997) 16 Cal.4th 153, 250 [constitutional issue raised for first time on appeal was waived].)

9